# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 24007**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Won KIM**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 15 August 2025

————————————

*Military Judge*: Christopher James.

*Sentence*: Sentence adjudged 16 August 2023 by SpCM convened at Osan Air Base, Republic of Korea. Sentence entered by military judge on 19 October 2023: Hard labor without confinement for 30 days, restriction to the limits of Osan Air Base for 30 days, forfeiture of $500.00 pay per month for 2 months, reduction to E-1, and a reprimand.

*For Appellant:* Captain Samantha M. Castanien, USAF.

*For Appellee:* Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Regina Henenlotter, USAF; Mary Ellen Payne, Esquire.

Before, JOHNSON, GRUEN, and KEARLEY, *Appellate Military Judges*.

Senior Judge GRUEN delivered the opinion of the court, in which Judge KEARLEY joined. Chief Judge JOHNSON filed a dissenting opinion.

————————————

[1] Appellant appeals his conviction under Article 66(b)(1(A), Uniform Code of Military Justice, 10 U.S.C. § 866(b)(1)(A) (*Manual for Courts-Martial, United States* (2024 ed.)).

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

GRUEN, Senior Judge:

A panel of officer and enlisted members sitting as a special court-martial convicted Appellant, contrary to his pleas, of two specifications of abusive sexual contact with an intent to gratify his sexual desires without consent and one specification of assault consummated by a battery, in violation of Articles 120 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920 and 928, respectively.[2] The members sentenced Appellant to hard labor without confinement for 30 days, restriction to the limits of Osan Air Base, Republic of Korea (ROK), for 30 days, forfeiture of $500.00 pay per month for four months, reduction to the grade of E-1, and a reprimand. Appellant submitted a clemency request to the convening authority to set aside the adjudged sentence in exchange for Appellant's acceptance of nonjudicial punishment and a discharge characterized as Under Other Than Honorable Conditions, or, in the alternative, that the convening authority suspend or remit Appellant's sentence of hard labor without confinement, restriction to base, forfeiture of pay, and rank reduction to the maximum extent allowed under the law. The convening authority took no action on the findings, but reduced the adjudged forfeiture of $500.00 pay per month from four months to two months.

Appellant asserts four issues that we have reworded: (1) whether Appellant's conviction for abusive sexual contact for touching EW's breast on divers occasions is factually insufficient; (2) whether Appellant's conviction for abusive sexual contact for touching EW's vulva with his thigh with intent to gratify his sexual desire is legally and factually insufficient; (3) whether the Government's failure to include post-trial motions and rulings rendered the record of trial (ROT) incomplete or alternatively constitutes other error for which relief is appropriate; and (4) whether Appellant's constitutional rights were violated when he was convicted of an offense without a unanimous verdict.[3]

_____

[2] Unless otherwise noted, all references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] We note this opinion is issued more than 18 months after Appellant's case was docketed with this court, which constitutes a facially unreasonable delay. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Because we set aside some of the findings and sentence on other grounds, we find it unnecessary to further address this issue in this opinion.

We have carefully considered issues (3) and (4) and find they neither warrant discussion nor relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)); *see also United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023) (holding an accused servicemember does not have a constitutional right to a unanimous court-martial verdict), *cert. denied*, 144 S. Ct. 1003 (2024). We address issues (1) regarding factual sufficiency, and (2) regarding legal and factual sufficiency of Appellant's abusive sexual contact convictions below. We agree with Appellant that the evidence is factually insufficient to support his convictions for abusive sexual contact upon EW in violation of Article 120, UCMJ. We therefore set aside and dismiss with prejudice the findings of guilty as to Specifications 1 and 2 of Charge I, and Charge I.

## I. BACKGROUND

### A. Relationship Between EW and Appellant

Appellant joined the Air Force on 18 May 2021 to become a language analyst, specifically a Korean linguist. He was stationed at Osan Air Base, ROK, beginning February 2022, where he met EW, also a Korean linguist stationed at Osan Air Base.[4] The two met at a barbeque after attending a work event in Seoul. At this event they spent most of their time together talking about personal interests and getting to know each other. At this event EW drank with and leaned up against Appellant and at some point Appellant kissed EW. EW testified that "[they] were both drunk, so . . . it wasn't like consensual." She claimed she did not really want to kiss but because they were both drunk it "wasn't that big of an issue at the time." This incident is not charged misconduct. During this same evening, EW invited Appellant to go to a baseball game she had planned to attend the next day with her friends. She invited Appellant because she "did want to get to know him."

On the next day, but before the game, EW "sat [Appellant] down . . . and talked to him, saying that . . . [she] wasn't really comfortable with what happened the night before, and that [she] was interested in him, but [she] wanted to get to know him more as a friend before [she] started dating him." In an effort to get to know Appellant better, the two discussed shared beliefs such as marriage, how many children they planned to have, their religions, and generally what they wanted out of life. EW testified the conversations "went well" and Appellant understood and respected her views.

---

[4] EW was at all times relevant to the offenses and trial an active duty Air Force member.

Over the next two weeks they would "hangout in [EW's] room, watch movies, [and] text each other." Sometimes they would go out with friends, but mostly they hung out in EW's room. Typically, they would cuddle on EW's bed with Appellant's arms around her. EW was comfortable with Appellant putting his arms over her shoulders when he was behind her while sitting up and over her stomach when they were lying down. They kissed as part of this cuddling and sometimes Appellant would lie on top of EW with his leg between her thighs, often moving or grinding his legs or hips on her body, which EW considered acceptable conduct. EW testified that during this time they would "make out occasionally" and that would include "tongue [and] multiple kisses." She testified she was comfortable with that, and she told Appellant she was comfortable with that. Appellant went to her room often enough that EW gave him her door code so he could enter her room anytime "with or without [her] there."

**B. Specification 1 of Charge I - Incidents During April 2022**

EW claimed that sometime in April 2022, on one occasion a couple of days after they began hanging out regularly in EW's room, they were cuddling in her bed while watching a movie. EW was not wearing a bra under her shirt, and Appellant moved his hand under her shirt on to the bare skin of her stomach. EW did not react. Appellant moved his hand up to EW's breast, which she then removed his hand from her breast and explained she "wasn't comfortable with that." She said she "just wanted to get to know him and that was pushing it too far into the line of . . . dating and intimacy." EW testified that Appellant responded by telling her he knew she wore a chastity ring, so she did not want to have sex before marriage. EW testified Appellant told her he was not going to make her take her ring off, but "as a man he needed certain things." EW testified that Appellant then moved his hand a second time back onto her breast in the same manner and "[a]t that point, [she] just let it go because he didn't listen the first time, so [she] didn't really know what to do, so [she] just let him do it." Further, EW did not want to cause any arguments about it.

EW testified Appellant touched her breast in a "similar manner two other times" and that the next time occurred a couple of days after the first incident described above. But EW provided no additional information regarding the touches and the trial counsel did not ask for additional information to develop the context of those incidents. There was no evidence that EW objected to the subsequent breast touches and she admitted "the line was blurred sometimes on what was okay and what was not." These four touching incidents formed the basis for Specification 1 of Charge I.

After Appellant touched EW's breast the first and second time, but before the subsequent two touches, EW and Appellant had a conversation about her

past feelings for another Airman, JK. She told Appellant she no longer wanted to be with JK and was trying to "get over him." She told Appellant she wanted to be with Appellant, but as friends at first. According to EW, Appellant was confident that he could get her to like him more than she liked JK so it would not be a problem to be in a relationship with EW knowing she was still "getting over" her feelings for JK. Appellant made clear he wanted to be with EW as a girlfriend and EW testified that when Appellant made his intentions clear, she "didn't have a problem with that" and was "glad that he . . . understood [her] feelings." She said he "understood [her feelings] well and didn't overreact or anything." On cross-examination, EW admitted that because she liked JK more than Appellant, it created conflict in her relationship with Appellant. She described how she would message JK while she was having deeply personal conversations with Appellant about matters such as marriage, abortion, and faith.

After the breast touching incidents, EW claimed she and Appellant "talked more about what was okay . . . in [their] friendship because the line was kind of blurred like what was friends and what was dating." She said they talked about whether "cuddling and like that was okay, or if any other touching was okay." She claimed she told Appellant that she was "fine cuddling or making out, but [she] didn't want to do anything else." EW claimed she told Appellant she did not want to be touched "anywhere else" to include her breast, but touching her shoulder and waist were fine.

## C. Specification 2 of Charge I - Incident of 11 May 2022

On 11 May 2022, EW had been at JK's home studying for her Weighted Airman Promotion System (WAPS) test. After EW returned to her dorm, Appellant went to her room, knocked once, put her door code in, and entered. EW was sitting in a chair next to her bed studying when Appellant entered her room. He questioned her as to where she had been and asked if she was okay because she had not messaged him. According to EW, Appellant "was more worried like that [she] hadn't been talking to him and where [she] was." She informed him she had been at JK's house. EW further stated Appellant did not react well to that, which is when EW moved from the chair to her bed "to be more at a talking level," while Appellant started talking to EW inquiring why she wanted to be with JK and not him.

EW testified she told Office of Special Investigations (OSI) agents that Appellant was sitting next to her on her bed and then he pushed her down. She later said that Appellant was standing in front of or over her while she was sitting on her bed and Appellant grabbed her wrists and pushed or pinned her down on the bed to where his chest was on her chest. Appellant "had his leg in between [her] legs touching [her] vulva and for about five minutes he was

talking to [her] . . . about why [she] wanted to be with [JK] and not [Appellant]." She said that she was "[p]retty annoyed because [she] had already told him before that [she] didn't want to be with him" but "he just wasn't understanding of that and wouldn't accept it" because Appellant kept texting her and bringing her "stuff at work just trying to win [her] over."

EW believed Appellant was angry. EW tried to push him off her, but Appellant pushed back and kept talking. She said it was about "a minute in" when she realized it was not going to be a "temporary just push me down real quick and then he was going to get off, but when he stayed there that's when [she] started pushing." She testified that at some point, she became scared because she did not believe she would be able to get away from Appellant if he tried "something more intense" like touching her or trying to have sex with her. This incident formed the basis for Specification 2 of Charge I.

EW further testified that Appellant was talking to her for about five minutes about why she wanted to be with JK and not him. She described how he was close to her face and after about five minutes of talking, he moved his head to her lips and tried to kiss her, and "after about 10 seconds of him kissing [her], he stopped and noticed that [she] had started crying, and he just got up and left." After Appellant left, EW said she "immediately called [JK] and asked him to come pick [her] up." While she waited for him, she began packing her stuff for the next day. Appellant texted EW within about 30 minutes of leaving her room to tell her he knew she was crying and asked her if she wanted to talk about it. This incident formed the basis of the assault consummated by a battery offense Appellant does not raise as an issue.

**D. The Aftermath**

According to the testimony of JK, when he went to pick EW up at her dorm on 11 May 2022, EW was waiting in the parking lot and he observed that she was "distraught" and "bawling her eyes out." JK did not testify as to what EW told him had occurred between her and Appellant, but whatever she told JK prompted him to want to give her options of what she could do, such as "how to report it." The first resource he provided EW was the Sexual Assault Prevention and Response (SAPR) office as "a good place to start." EW told JK she did not feel safe at her dorm room, so JK let her stay with him "one to two nights."

Soon after JK picked up EW on 11 May 2022, EW and JK developed a romantic relationship that JK described as "some sort of relationship" that "was never officially more than a relationship" and that did not last for very long

because he had different feelings for EW than she had for him.[5] EW also testified that she had started a "romantic relationship" with JK soon after the 11 May 2025 incident yet they "didn't officially date . . . ." EW also admitted that she "ultimately" got what she wanted by being romantically involved with JK, although not being official. At the time, JK was 30 years old, and EW was 21 years old. Even though they had ended their romantic relationship, they continued to communicate regularly until EW became interested in another person and told JK that they "shouldn't be talking as much out of respect for that other relationship."

Following the 11 May 2022 incident, Appellant texted EW multiple times. EW only responded to a couple of Appellant's texts. At first the texts focused on Appellant asking EW why she was ignoring him. On Friday, 13 May 2022, Appellant went to see EW in person, and it was at this time that EW told Appellant she believed he had assaulted her on 11 May 2022. There was no more testimony about this conversation between EW and Appellant. Instead, the remainder of the evidence related to this offense revolved around text messages.

Prosecution Exhibit 1 includes eight pages of text messages between Appellant and EW occurring after the 11 May 2022 incident and before and after the 13 May 2022 disclosure regarding how she felt about the incident.[6] The messages from 11 May to 13 May focus on Appellant asking EW why she was ignoring him.

The text messages after 13 May 2022 involve Appellant addressing the assault allegation. In a text message Appellant wrote to EW on 14 May 2022, he stated in part, "im so sorry I didnt know you felt that way. You have all the right to be angry and it is all my fault that i made you feel so uncomfortable." He further stated, "I would never ever try to sexually assault you yet it is entirely my fault for making you feel that way."

In a text message Appellant wrote to EW on 15 May 2022, he stated in part, "I was shocked by what you said to me friday night. Honestly I thought you were angry at me for the things I said between you and [JK] and the aggressive nature it came out as." He further stated, "When I barged into your room Friday night, even though I didn't ask for your consideration I thought you would come around and be willing to talk to me.. which was me taking advantage of

---

[5] JK also testified that he had been in a long-term relationship with another woman since 2019 and had broken off the relationship just prior to the 11 May 2022 incident. EW knew of his recent break-up and informed JK that she would like to be his girlfriend.

[6] The quoted text messages appear in their original form, except where bracketed.

your kind nature and the previous affection you've shown to me." He further explained, "When you kept on refusing to talk I had to ask because I wanted to know if I was missing something such as the reason why you were so angry with me."

In response to EW's allegation that Appellant sexually assaulted her on 11 May 2022, which Appellant first became aware of on 13 May 2022, he explained:

> The answer you gave me was a shocking one and one that I am still trying to digest... Ever since you said I sexually assaulted you, I've been thinking about my actions of Weds night. I tried to kiss you in hopes of starting another intimate moment like we had before. I put my leg between your legs in hopes of making you give in to your feelings.. which I'd assumed was still an active interest in me. You tried to push me away several times when I was on top of you but I thought if I back away now, your feelings towards [JK] would get stronger over time since you always expressed you like him and now he is a single man.. and I wanted you to commit to me. I thought lightly of what I've done because we had intimate moments before... and in all my actions, it never crossed my mind that I was sexually assaulting you. And I am very sorry.

In a text message Appellant sent to EW on 23 May 2022, Appellant stated, "Hey I like you. I would never take advantage of you. I really think we had a different read on what was going on and i really feel terrible you were hurt because of me."

In a text message Appellant sent to EW on 25 May 2022, Appellant stated, "there has to be a different reason," referring to why EW would not respond to his texts. He added, "You cant be this heartless and turn into a different person just like that. All I was trying to do was try to make out with you like before. I was really surprised when you started crying too."

In a text message Appellant wrote to EW on 26 May 2022, he stated in part:

> Hey but i just don't get it. Its your life and if you want to cut me out thats your choice. But no matter how much I think about this, i feel like youre taking this too extreme... or im missing something and you gotta fill me in. [. . .] You felt like you were getting sexually assaulted. We did the same thing and more a week prior so i was just trying to do that again. [. . .] I gotta be missing something.

When asked on direct examination if "[Appellant] ever pinned [EW] before" the 11 May 2022 incident, EW responded, "Yes, at one point, playfully he had my hands behind my back and was kissing me." During cross-examination, trial defense counsel asked EW about Appellant's text to her which stated, "we did the same thing and more a week prior." Here, EW confirmed this statement was in relation to that consensual playful occasion and added that approximately one week prior to 11 May 2022, Appellant "had [her] hand behind [her] back laying [her] down [while] kissing [her]," all of which was consensual. EW further testified that this was an example of how sometimes the lines in her relationship with Appellant "were blurred."

Approximately four months later, in September 2022, EW learned Appellant was in a new relationship. It was at this point EW made an unrestricted report to a Sexual Assault Response Coordinator (SARC) about the 11 May 2022 incident. The SARC informed EW that they could not help her because what she described was not a sexual assault. The SARC recommended she speak to a special victim's counsel (SVC), who also told her they could not represent her because what she described was not a sexual assault. She then reported to an OSI agent, where EW was similarly told she was not reporting conduct that amounted to a sexual assault or crime.

The record does not reflect what version of events EW reported to these individuals, but it is clear that EW did not report at that time those occasions in which Appellant touched her breast. After being turned away from all three organizations, she returned to OSI and for the first time told them that Appellant had sexually assaulted her by touching her breast without her consent. It was only after this later allegation that the OSI, the SARC, and the SVC became involved in the matter. On 5 October 2022, EW sat down with OSI for a formal interview.

## II. DISCUSSION

### A. Law

#### 1. Legal and Factual Sufficiency

We review issues of legal sufficiency de novo. *United States v. Harrington,* 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019)). Our assessment of legal sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United*

*States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, 85 M.J. 213, 217 (C.A.A.F. 2024) (internal quotation marks and citation omitted).

We review questions of factual sufficiency when an appellant asserts an assignment of error and shows a specific deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The current version of Article 66(d)(1)(B), UCMJ, states:

(B) FACTUAL SUFFICIENCY REVIEW.

> (i) In an appeal of a finding of guilty under subsection (b), the [c]ourt may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

> (ii) After an accused has made such a showing, the [c]ourt may weigh the evidence and determine controverted questions of fact subject to—

>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

>> (II) appropriate deference to findings of fact entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), the [c]ourt is clearly convinced that the finding of guilty was against the weight of the evidence, the [c]ourt may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). This factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is

for an offense occurring on or after 1 January 2021. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (2021).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . will depend on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.* at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, this court must decide that evidence, "*as the CCA has weighed it*, does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, this court "must be clearly convinced of the correctness of this decision." *Id.*

**2. Elements**

As charged, in Specifications 1 and 2 of Charge I, the elements for abusive sexual contact without consent are that (1) Appellant committed a sexual contact upon EW; and (2) that Appellant did so without EW's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(4)(d). "Sexual contact" means, as relevant to the specifications, touching EW, either directly or through the clothing, on her breast with his hand or her vulva with his thigh, with an intent to gratify his sexual desire. *MCM*, pt. IV, ¶ 60.a.(g)(2). "Consent" is defined as "a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." *Id.* "A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent." *Id.* "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

**3. Defense of Mistake of Fact as to Consent**

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the

11

circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id*. Therefore, an honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to the charged offense. *See, e.g., United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of mistake of fact to a charge of sexual assault). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense did not exist. R.C.M. 916(b)(1); *McDonald*, 78 M.J. at 379.

In evaluating whether the defense of mistake of fact as to consent was raised at trial, we "consider the totality of the circumstances at the time of the offense" and consider "whether the record contains some evidence of an honest and reasonable mistake to which the [factfinder] could have attached credit if [the factfinder] had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citations omitted). While the quantity of evidence required is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) ("[W]hile [the] [a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable." (citation omitted)); *see also United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) ("The testimony relied on by appellant tended to show objective circumstances upon which a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances." (citation omitted)). If a mistake is honest yet "patently unreasonable," the defense is unavailable to an appellant. *Davis*, 76 M.J. at 230.

When determining what is reasonable, the standard is an objective one. *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *17 (A.F. Ct. Crim. App. 14 Oct. 2021) (unpub. op.). "The actor is required to do what this ideal individual would do in his place. The reasonable man is a fictitious person, who is never negligent, and whose conduct is always up to standard." *Id.* at *17–18 (quoting RESTATEMENT (SECOND) OF TORTS § 283C cmt. d (Am. Law Inst. 1965)). In *United States v. Greaves*, our superior court stated,

> It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one must be seen as exercising due care with respect to the truth of the matter in issue.

40 M.J. 432, 437 n.5 (C.M.A. 1994).

**B. Analysis**

Appellant makes a request for a factual sufficiency review for both specifications of abusive sexual contact—Specifications 1 and 2 of Charge I. He also asserts an assignment of error for each abusive sexual contact specification, and claims a deficiency in proof for both specifications. While we do not agree that Appellant's convictions for abusive sexual contact are legally insufficient, we do agree with Appellant that his convictions are factually insufficient.

Appellant argues his convictions for abusive sexual contact as represented in both specifications of Charge I are factually insufficient with respect to both lack of consent and mistake of fact, claiming, "EW did not testify to a lack of consent and even if she did, the Government did not disprove reasonable mistake of fact as to consent." The Government argues, *inter alia*, that disagreement with a verdict or conclusion of a factfinder is insufficient to establish a deficiency of proof; minor inconsistencies in victim's testimony do not establish a specific deficiency of proof; and there was no reasonable mistake of fact as to consent for either the breast or vulva touches. We do not find the Government overcame the deficiencies of proof or proved beyond a reasonable doubt that the defense of reasonable mistake of fact as to consent did not exist. Therefore, we agree with Appellant that his convictions for both specifications of abusive sexual contact are factually insufficient.[7]

**1. Specification 1 – Unlawfully Touching EW's Breast on Divers Occasions**

Appellant asserts his conviction for unlawfully touching EW's breast on divers occasions is not factually sufficient because EW did not testify to a lack of consent, and even if she did, the Government did not disprove reasonable mistake of fact as to consent beyond a reasonable doubt. We agree.

EW did not provide testimony that proved lack of consent to the breast touchings. EW testified to four incidents of breast touching: two that occurred on the same evening and two more that occurred later. The Government provided no details about the third and fourth breast touching incidents apart from EW's testimony that they occurred in "a similar fashion" to the first two. Given the lack of any additional evidence as to the third and fourth touching, we will focus our analysis on the first and second.

---

[7] Appellant also asserted an assignment of error for legal insufficiency for the second specification of Charge I. Because we find his conviction for this specification to be factually insufficient, we do not further discuss legal sufficiency.

Appellant argues that when the first breast touching occurred, the two of them were cuddling, Appellant was trying to "advance their relationship," and he had no reason to believe EW would not consent to him touching her breast. According to EW, the first time Appellant touched her breast, they were cuddling in her bed and he had his arm either around her waist or over her shoulder. EW was not wearing a bra and she did not object to him having his hand on her bare skin under her shirt immediately prior to him "cupping [her] breast." Before this breast touch, EW had expressed to Appellant she did not want to have sex or touching of her vulva, but there is no evidence that before this first breast touch, she told him she did not want him to touch her breasts. She claimed that she removed his hand and told him she was uncomfortable with that conduct because that was "pushing it too far into the line of . . . dating and intimacy." Appellant then took his hand off her breast and they discussed the boundaries of their relationship.

While EW told Appellant she was uncomfortable after she removed Appellant's hand, we find that the Government did not prove a lack of consent to this first touch before it happened. Given that EW's own testimony describes that she was "fine with cuddling or making out" and admitted that "the line was blurred sometimes on what was okay and what was not," and had only verbally drawn the line of contact at her vulva before the first breast touch, the Government's burden to prove lack of consent before the first touch is high and they did not meet it.

However, even if EW did not consent, we find Appellant had an honest and reasonable mistake of fact as to consent regarding the first breast touch and the Government did not meet its burden to prove Appellant's mistake of fact was unreasonable. EW was specific as to what conduct she did not consent to—sex and vaginal touch. Appellant and EW had previously kissed and made out on other occasions, so some level of physical intimacy was acceptable to EW. She was in her bed braless next to Appellant and allowed him to rest his hand on her stomach under her bare breasts. Given the circumstances involved, Appellant could have reasonably had an honest mistake of fact as to EW's consent to breast touching since she explicitly indicated sex and vaginal touch were off limits, but did not include breast touching. Furthermore, EW admitted multiple times that the lines were blurred as to their relationship and what would be acceptable and the Government did not meet its burden in disproving a mistake of fact beyond a reasonable doubt. Therefore, this first incident is factually insufficient to prove lack of both consent or absence of mistake of fact as to consent.

Like the first breast touching, we find the conviction for the second breast touching factually insufficient because the Government did not prove both that

EW did not consent to this touching and that Appellant did not have a mistake of fact as to consent due to the nature of Appellant's and EW's relationship.

Following the first breast touch, Appellant and EW discussed respecting EW's boundaries while still in bed. They discussed EW's chastity ring and Appellant indicated he "wasn't going to make [her] take [it] off," implying that he would not pursue sexual intercourse. Appellant shared how "as a man he needed certain things." The record does not indicate how long this conversation lasted. At some point after this conversation, Appellant placed his hand back on EW's breast. EW testified that she "just let it go" and "just let him do it." There was no further testimony about how long he kept his hand on her breast, or how that evening ended, or if boundaries were discussed again. There was no evidence that EW moved away, got up and put on a bra, or told Appellant she was uncomfortable. Based on EW's own testimony that she "just let him do it," there is not proof beyond a reasonable doubt that she did not consent to this second breast touch, especially since there was a break between the two touching incidents. During this break, it is significant that EW and Appellant discussed boundaries and each other's needs and thoughts about going further as given the nature of their relationship where EW was fine with "cuddling or making out" and creating lines that were "blurred sometimes on what was okay and what was not." The evidence, under the unique circumstances of this case, did not convince us that a firm line was drawn between the two touchings – especially since Appellant recognized the boundary of her ring, expressed his desire and tried again only to have her in her own words "let him do it." The Government had the burden to disprove lack of consent beyond a reasonable doubt and it failed to do so.

Two other facts weigh heavily against the Government with respect to consent. The first is that when EW first spoke to the SARC, the SVC, and the OSI agent, she apparently did not discuss non-consensual breast touches because EW left each discussion with the impression that they could not help her because what she reported was not a sexual offense. It was not until almost five months later that these organizations began investigating EW's report as a sexual offense because after EW discovered Appellant had a new girlfriend, EW returned to the OSI and revealed the multiple non-consensual breast touches.[8]

The second fact weighing heavily against the Government's case for lack of consent to the breast touches is the lack of discussion about breast touching in the text exchange between EW and Appellant. In all of the text messages

---

[8] EW made one initial restricted report to the SARC. The record contained no evidence about what went into this restricted report or when exactly it was made.

following the 11 May 2022 incident, EW never mentioned that she also felt the alleged breast touches were non-consensual—she simply did not mention them at all.

However, even if EW did not consent to the second breast touch, Appellant had an honest mistake of fact as to her consent that was reasonable given the relationship they had to that point. Appellant argues his relationship with EW was "full of blurred lines" and EW admitted the same while testifying. The Appellant may have believed that in their discussion after the first breast touch incident he had negotiated a new line in their relationship and by EW not expressing further lack of consent to breast touching, she was consenting to breast touching. This belief would have been reinforced by her own admission of "let[ting] it go" and "just let[ting] him do it."

Furthermore, Appellant highlights EW's testimony about their "make out sessions" and how this testimony showed a relationship evolving into a dating relationship making it reasonable for Appellant to continue to advance that relationship from cuddling, to making out, to upper body touching. While EW claimed she and Appellant were in the friend zone as opposed to him being her boyfriend during the time frame he touched her breast, she provided him the code to her dorm room so he could have access with or without her being present. In addition, while they would go out with friends together, her testimony was that "mostly [they would be together] just in [her] room alone," on her bed, "cuddling with [his] arm around [her]" and kissing, and sometimes Appellant would be on top of her while they grinded their bodies together intimately—to include their pelvic regions—sometimes with EW not wearing a bra. Their discussions evolved and included discussions on intimate subjects, such as marriage, children, religion, and abortion. It is not unreasonable for Appellant to have believed that he had negotiated a new level of physical intimacy that would still respect her limits on sexual intercourse and lower body touches, but which allowed other intimate touches—to include her breasts—as their relationship evolved into increasing levels of intimacy.

Another example of the "blurred lines" between Appellant and EW can be seen in how EW had formulated her own definitions and beliefs regarding what was or was not consensual behavior and how she characterized her first kiss with Appellant. On the evening of the squadron event when EW and Appellant first interacted, EW drank alcohol with Appellant and leaned on and showed affection to him willingly because she was "trying to get to know him." She admitted that they kissed for about ten seconds. At trial, EW described this initial kiss by stating, "[W]e were both drunk, so I – it wasn't like consensual. I didn't really want it, but I said we were drunk so it wasn't as big of an issue then." EW claimed she told Appellant the next day that she had not wanted to

kiss him the night before. While she may not have wanted to kiss him that night, that does not mean the kiss was non-consensual. Additionally, after this discussion, over the next several weeks, EW and Appellant continued to kiss and make out, which likely created a reasonable belief on the part of Appellant that their relationship was progressing, and it would be his persistence that advanced the intimacy in their relationship, which they both expressed they welcomed.

The evidence supports both the subjective "honest" and the objective "reasonable" mistaken belief that EW consented to the breast touches. *See Davis*, 76 M.J. at 230 (holding that if a mistake is honest yet "patently unreasonable," the defense is unavailable to an appellant). The evidence supports Appellant's claim that their relationship boundaries were confusing because EW would state a boundary, but then consensually allow Appellant to step over the line of said boundary, or EW would otherwise engage in consensual conduct with Appellant that "blurred" the lines of permissible conduct in their relationship. There is sufficient evidence to support Appellant had an honest mistake of fact as to consent and there is sufficient evidence that given the nature of their relationship mistake of fact as to consent by Appellant was also reasonable.

It was the Government's burden to show that Appellant did not have a mistake of fact as to consent beyond a reasonable doubt, either by proving that Appellant did not honestly believe he touched EW without consent or that Appellant's mistaken belief was unreasonable under the circumstances. The Government did not meet this burden. As such, we are clearly convinced that the finding of guilty was against the weight of the evidence because it "does not prove that the appellant is guilty beyond a reasonable doubt" and we are "clearly convinced of the correctness of this decision." Article 66(d)(1)(B), UCMJ (2024 *MCM*).

### 2. Specification 2 – Unlawfully Touching EW's Vulva with His Thigh

With respect to Specification 2 of Charge I alleging Appellant touched EW's vulva with his thigh without her consent, Appellant argues that his conviction is legally and factually insufficient because the Government failed to prove what it specifically charged, to include intent. With regard to factual insufficiency, we agree.

Appellant was charged and convicted of assault consummated by a battery for the incident on 11 May 2022 that involved him laying on top of EW for several minutes talking with her very closely to the point she could feel his breath on her cheek. Towards the end of this encounter, he tried to kiss her for about ten seconds. They were both fully clothed. The kiss forms the basis of the offense of assault consummated by a battery. Appellant raises no issue with

that offense, and we find none. We address it here because during the kissing incident, the Government alleges Appellant touched EW's vulva with his thigh, with the intent to gratify his sexual desire. Appellant was separately convicted for touching EW's vulva with his thigh as abusive sexual contact without consent with an intent to gratify Appellant's sexual desires.

In order to prove that Appellant committed abusive sexual contact as charged, the Government would have to prove beyond a reasonable doubt that (1) Appellant committed a sexual contact upon EW; and (2) that Appellant did so without EW's consent. *MCM*, pt. IV, ¶ 60.b.(4)(d). "Sexual contact" means, as relevant to the charges, touching EW's vulva with his thigh, either directly or through clothing, with an intent to gratify his sexual desire. *MCM*, pt. IV, ¶ 60.a.(g)(2).

The Government argues that when Appellant was in EW's room, "he pinned her to the bed and put his *thigh* between her legs so it was against her vulva." (Emphasis added). The Government's argument is primarily flawed in that EW did not testify that Appellant put his "thigh" between her legs so that it was against her vulva—she only testified that Appellant "had his *leg* in between [her] legs touching her vulva for about five minutes." (Emphasis added). Trial counsel similarly argued that Appellant "shoved his knee between her legs, touching her vulva with his leg," but that was not the testimony provided by EW, nor was it charged by the Government.

Trial counsel also failed to elicit any additional details about the alleged leg-vulva touch beyond this singular sterile statement to clarify what part of EW's body Appellant had allegedly touched. In response to the trial counsel's question about the incident on 11 May 2022, EW testified:

> He had his leg in between my legs touching my vulva and for about five minutes he was talking to me, talking about why I wanted to be with [JK] and not him.

While the military judge defined "vulva" for the members as "the external genital organs of the female, including the entrance of the vagina and the labia majora or labia minora," it is not clear EW understood the legal definition of "vulva" when testifying, or that this was the actual area where Appellant touched her on this incident. She provided no testimony to show her pelvic region was different from her vulva or why or how Appellant's leg position on 11 May 2022 was different from how he would position himself on her in prior,

consensual interactions.[9] Both EW's testimony and trial counsel's interpretations of her testimony were insufficient to prove the sexual contact as charged beyond a reasonable doubt.

Our decision rests on two significant shortcomings with the Government's evidence: (1) the lack of evidence supporting Appellant's thigh touched EW's vulva; and (2) the lack of evidence that this touching was done for the purpose of arousing Appellant's sexual desire. In regard to the first, one might want to assume that if Appellant's leg was touching her vulva that it must have been his thigh or that if he was lying on top of her *maybe* his thigh was touching her vulva, but "thigh" and "vulva" are very specific body parts and the distinction matters given the charged offense. One might also assume that such a distinction does not render the proof offered at trial insufficient to support the charged offense. We disagree. This court has found that when the Government has charged a certain body part touched another body part in a way that renders the conduct criminal, the evidence at trial must be specific to the charged conduct. For example, in *United States v. Chesser*, this court found that the military judge abused her discretion by accepting a guilty plea for assault consummated by a battery where the specification alleged Appellant had "pushed [the victim] on the torso with his hands." No. ACM 39207, 2018 CCA LEXIS 229, at *7–8 (A.F. Ct. Crim. App. 4 May 2018) (unpub. op.). Specifically, Appellant in that case provided during his providence inquiry that he used the outside of his forearm, not his hands, to push the alleged victim's shoulder rather than her torso. *Id.* at *5–6. Because the conduct described by Appellant was not specific to the charged conduct, this court struck the words "on the torso with his hands" from the specification and found the military judge had abused her discretion in finding Appellant's plea provident with respect to those words. *Id.* at *7–8.

In the case at bar, the court could not simply except the word "vulva" and substitute another body part because it is the allegation that the vulva was touched that makes the alleged conduct sexual and a violation of Article 120, UCMJ, rather than a non-sexual assault. EW testified that pelvic touching in the form of grinding occurred between the two consensually during their relationship and described the way Appellant would position himself on top of her during these consensual pelvic touching interactions. Her testimony regarding how Appellant positioned himself on her body as to the charged offense when he allegedly touched his thigh to her vulva was similar if not exactly in the

---

[9] Prior to this incident, EW testified that the two would have consensual make out sessions which involved Appellant laying on top of her with his leg between her thighs and grinding their pelvic regions together.

same manner. The only difference was that he was not moving his legs or pelvis around on top of her in a "grinding" motion on 11 May 2022. EW provided no testimony as to why on 11 May 2022, it was her vulva he touched as opposed to her pelvic area. She provided no information to determine if she knew the difference between the pelvic region and vulva or how his "leg" was able to position itself on her vulva. She in fact never testified that it was his thigh that touched her vulva. The specifics of a charged offense matter and the evidence elicited at trial must match the alleged criminal conduct.

In regard to the second significant shortcoming, the Government failed to prove that any touching of her vulva was with the intent to gratify his sexual desires. It seems such touching, if it was on her vulva, happened as a result of him pinning her down to talk with her. According to EW, while Appellant had one of her hands in each of his hands and their forearms were aligned, he "proceed[ed] to talk to [her]." There was no evidence that during this time he was trying to be sexual or was pressing his leg or groin area into her with an intent to satisfy his sexual desires. EW did not describe a situation that was similar to other situations where they would grind their pelvic areas together. Conversely, EW testified that this interaction was different. During cross-examination, EW shared that during consensual make out sessions Appellant would move his leg and hips:

> [Defense Counsel (DC):] . . . On 11 May [2022], you said that his leg was between your thigh again, right?
>
> [EW:] Yes, sir.
>
> [DC:] On this occasion he wasn't moving his legs.
>
> [EW:] No, sir.
>
> [DC:] He wasn't rubbing it against you in any way.
>
> [EW:] No, sir.
>
> [DC:] He wasn't moving his hips.
>
> [EW:] No, sir.
>
> [DC:] He wasn't like as I would say kind of grinding his leg between your legs.
>
> [EW:] No, sir.
>
> [DC:] It was just kind of lying there.
>
> [EW:] Yes, sir.

This court recognizes that after about five minutes of talking, he moved his head and lips to hers and tried to kiss her. She tightened her lips and tried to keep him from kissing her. After about ten seconds of him trying to kiss her, he noticed she was crying, immediately stopped what he was doing, got off of her, and left her dorm room. However, the kissing incident is captured in a separate offense.

The only evidence produced regarding Appellant's intent in how he pinned EW down was in a text message he sent EW after the incident where in reply to her text he stated, "I put my leg between your legs in hopes of making you give into your feelings., [sic] which I'd assumed was still an active interest in me." First, he only addressed legs between legs, not his leg on her vulva. Second, we have limited context to understand this text message since the court received limited details about the conversation EW and Appellant had preceding this message. However, it seems Appellant is talking about the manner in which he pinned EW down to talk with her and eventually, after five minutes, try to kiss her. He was not specific as to the placement of his leg being on her vulva, nor did he discuss his sexual desires. Based on the evidence produced at trial, we do not find the Government proved that Appellant specifically intended to place his leg sexually on EW during this interaction or with the intent to gratify his sexual desire.

Given that we do not find the Government proved what they charged—that Appellant touched EW's vulva with his thigh with the specific intent to satisfy his sexual desires—we find insufficient evidence to support a conviction for abusive sexual contact. In light of this finding, we review this charge for consideration of a lesser included offense (LIO) for assault consummated by a battery. We do not find the LIO is appropriate as the leg touching occurred when Appellant pinned EW down and tried to kiss her. Appellant's conduct in lying on top of EW holding her arms in a way as to prevent her from getting up as he talked to her and tried to kiss her constitutes facts and circumstance surrounding the assault consummated by battery offense, for which Appellant was charged and convicted in a separate specification. Under the totality of the circumstances supporting the assault charge, the other conduct effectuating the attempted kiss is "res gestae," *i.e.*, "part and parcel" of the offense. *See United States v. Keith*, 17 M.J. 1078, 1079–80 (A.F.C.M.R. 1984) (holding that "res gestae" evidence "includes conduct, or misconduct not charged, which is admissible because it is so closely intertwined with the offense charged as to be part and parcel of that offense" (citation omitted)).

After weighing all the evidence and having given appropriate deference to the fact that the trial court saw and heard the witnesses, we find that the findings of guilty for the specifications of Charge I were against the weight of the

evidence and therefore, are factually insufficient. We are clearly convinced of the correctness of this decision.

## III. CONCLUSION

The findings of guilty to Specifications 1 and 2 of Charge I and to Charge I are **SET ASIDE**. Charge I and its Specifications are **DISMISSED WITH PREJUDICE**. The sentence is **SET ASIDE** and the case is returned to the Judge Advocate General for further processing consistent with this opinion. A rehearing on the sentence is authorized. Article 66(f)(2), UCMJ, 10 U.S.C. § 866(f)(2) (2024 *MCM*). We will complete our Article 66, UCMJ, 10 U.S.C. § 866, review when the record is returned to the court.

JOHNSON, Chief Judge (dissenting):

I respectfully dissent. I would affirm the findings of guilty as to Specification 1 of Charge I, with modifications; affirm the findings of guilty as to Specification 2 of Charge I, and Charge I, as legally and factually sufficient; affirm Specification 1 of Charge II, and Charge II[1] as legally sufficient; and reassess the sentence.

## I. BACKGROUND

EW and Appellant were members of the same squadron at Osan Air Base, Republic of Korea. Their first significant interaction was as part of a group of about ten people who were "singing, drinking, [and] having fun" at a karaoke bar. Appellant and EW were both "drunk." They kissed, and EW invited Appellant to join her and several friends who were going to a baseball game the following day. Before the game, EW spoke with Appellant and told him she "wasn't really comfortable with what happened the night before," and while she "was interested in him," she "didn't want to move fast" and "wanted to get to know him more as a friend before [she] started dating him."

Over the following two weeks, Appellant and EW would "hang[ ]out in [her] room, watch movies, [and] text each other." EW gave Appellant the door code to unlock her room because she was "lazy" and so "[h]e could just come in without [EW] getting up;" she had given her door code to other friends as well, which she considered "normal." When they watched movies in her room they

---

[1] Because Appellant does not challenge on appeal the findings of guilty as to Charge II or Specification 1 of Charge II, I do not review for factual sufficiency nor do I further address those findings.

would typically "cuddl[e]" with Appellant's arm around EW. Occasionally they would "make out," by which EW meant kissing, including using their tongues

"About a couple of days" into this "hanging out" phase of the relationship, Appellant and EW were sitting together watching a movie with Appellant's arm on EW's shoulder. EW was not wearing a bra. Appellant moved his arm around EW's waist, then put his hand under her shirt, and then "cupp[ed]" her breast with his hand. EW moved Appellant's hand off her breast and told him she "wasn't comfortable with that." In response, Appellant "told [EW] that he knew that [she] was wearing a chastity ring, so [EW] didn't want to have sex before marriage. He told [her] that he wasn't going to make [her] take [her] ring off, but as a man he needed certain things." Appellant then put his hand back on her breast in the same manner. Because Appellant "didn't listen" to her the first time, and EW "didn't want to cause any arguments," she "didn't really know what to do, so she just let him do it."

At some point after this breast-touching incident, EW told Appellant she had feelings for Staff Sergeant (SSgt) JK, another member of their unit. EW was "trying to get over" SSgt JK because he had a girlfriend, but they remained friends. In response, Appellant said he was "fine" with EW getting over SSgt JK while she was in a relationship with Appellant. Appellant was confident he would "have [EW] like as a girlfriend." EW was "glad" that Appellant "understood her feelings" and "didn't overreact." EW also spoke with Appellant about what sort of physical contact she was and was not comfortable with. She told him she "was fine cuddling or making out," including touching her on the waist or shoulder, "but [she] didn't want to do anything else," such as "[t]ouching [her] breast [or] touching her anywhere else."

Despite this conversation, EW testified Appellant subsequently "touched [her] breast in a similar manner" to the prior occasion "two other times." However, at trial EW provided no details about these incidents.

At some point prior to 11 May 2022, EW "told [Appellant] that [she] didn't have any interest in dating him anymore; that [she] just wanted to be friends but nothing else."

On 11 May 2022, EW studied for her promotion test at SSgt JK's house. Appellant sent repeated messages to EW asking where she was, but EW "was ignoring them because [she] didn't want to deal with it. [She] had already told him [she] didn't want to be with him anymore."

When EW was done studying, she returned to her room. Appellant arrived and asked EW where she had been; she told him she was at SSgt JK's house. At trial, EW testified to what happened next:

> At that point, I was sitting on my bed, and he was standing in front of me. And then, he grabbed my wrists and pushed me down on the bed to where his chest was on my chest. He had his leg in between my legs touching my vulva and for about five minutes he was talking to me, talking about why I wanted to be with [SSgt JK] and not him. And he was really close to my face. He had my nose -- his nose on my cheek, so I had my head turned so he wouldn't be on my lips. And I could hear -- I could feel his mouth moving when he was talking to me, and after about five minutes he moved his head to my lips and started trying to kiss me, and he was trying to stick his tongue in my mouth as well.

EW clarified that "when [Appellant] grabbed [her] wrists and pinned [her] down . . . his forearms were aligned with [her] forearms." EW testified that when she repeatedly tried to push Appellant off, he pushed her back and held her down. EW "told him [to] please get off of [her]" at least ten times, but Appellant "wasn't listening" and "just kept talking" until he began trying to kiss her, putting his "tongue [ ] all over [her] lips," which she kept shut. About ten seconds after Appellant began trying to kiss EW, "he stopped and noticed that [she] had started crying, and he just got up and left" without speaking to her further.

EW then called SSgt JK and asked him to pick her up, which he did. SSgt JK observed that EW was "very distraught" and was "bawling her eyes out" when she was in his car. When EW eventually told SSgt JK what had happened, he suggested she contact the Sexual Assault Prevention and Response (SAPR) office. Because EW did not feel safe returning to the dormitory, SSgt JK let her stay in the guest room of her house for "one or two nights," during which he observed EW "pretty much stayed to herself . . . in the guest bedroom" and still seemed "very distraught and just traumatized." EW testified that she made a restricted report of sexual assault after 11 May 2022, significantly before she later reported Appellant's actions to law enforcement in October 2022.[2]

After the incident in EW's room on 11 May 2022, Appellant sent EW a series of text messages. At 2309 on 11 May 2022, the night of the incident, he texted:[3]

---

[2] EW testified she could not remember exactly when she made the restricted report, but "[i]t might have been a month after the incident had happened."

[3] As stated in the opinion of the court, quoted text messages appear in their original form, except where bracketed.

> You might hate me but don't hate what i got you today. I went to the convenience store the past 1.5 weeks looking for that thing and i finally got it. Its considered a rare item in korea right now. Eat it or wipe off your tears with it.. and when youre done crying consider chatting with me again tonight. I'd hate to end on a negative note with you and continue from that with you the next day.

On 13 May 2022, after EW returned to her dorm room, Appellant entered her room uninvited while she was there. EW testified Appellant sat on the floor for approximately five minutes without speaking. EW told Appellant to leave approximately ten times and that she "didn't want him in there," but he did not respond until he eventually left. Later text messages indicate that while Appellant was in the room, EW accused him of having sexually assaulted her on 11 May 2022.

In the early morning hours of 14 May 2022, Appellant sent EW a message beginning, "im so sorry i didn't know you felt that way." He denied he would ever try to sexually assault her, but stated EW "ha[d] all the right to be angry" and "it [wa]s entirely [his] fault for making [her] feel that way." After further apologies and appreciation for EW, Appellant promised he would not "bother," "call," or "message" her, and "just hope[d] one day [EW would] forgive [him] for what [he had] done and talk to [him] again."

Despite his promises, Appellant continued to send messages to EW which ranged in tone from apologetic to confused to resentful. Notably, on 15 May 2022 Appellant sent EW a lengthy message which stated, *inter alia*, he thought EW was angry because of what Appellant had said about SSgt JK, and he was shocked when EW accused him of sexual assault when he went to her room on 13 May 2022. He further stated that on 11 May 2022 he "tried to kiss her in [the] hopes of starting another intimate moment like [they] had before," and he "put [his] leg between [her] legs in hopes of making [her] give in to [her] feelings." He acknowledged that she "tried to push [him] away several times when [he] was on top of [her] but [he] thought if [he] back[ed] away now, [her] feelings toward [SSgt JK] would get stronger over time since [she] always expressed [she] like[d] him and now he is a single man . . . ."

EW sent few responses to these messages, none of them lengthy or encouraging, and on 16 May 2022 she asked Appellant to stop messaging her. EW stopped responding to Appellant's texts entirely after 23 May 2022. Appellant sent his final text to EW on 5 June 2022.

## II. LAW AND ANALYSIS

25

I generally agree with the recitation of the applicable law in the majority opinion. I further agree that Appellant has made a sufficient specific showing of a deficiency of proof with respect to Specifications 1 and 2 of Charge I that we may consider the factual sufficiency of these convictions. *See* Article 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). However, I reach a different conclusion than the majority.

## A. EW's Testimony Generally

Before turning to the specific evidence regarding each specification, I recognize the Government's case regarding the specifications of Charge I rested heavily on EW's testimony. The court members observed EW's testimony and evidently found her credible, based on the findings. Certain circumstances may have contributed to their conclusion. For example, they might have considered SSgt JK's testimony was generally consistent with EW's and that to him she appeared genuinely distraught after the 11 May 2022 incident. They may have also considered that shortly after the incident EW evidently accused Appellant directly of "sexually assaulting"[4] her, told SSgt JK about the incident on the same night it occurred, and made a restricted report relatively close in time to the incident. In addition, I do not find the potential motives for EW to falsify her testimony persuasive. Giving "appropriate deference to the fact that the trial court saw and heard the witnesses," for purposes of determining whether I am "clearly convinced that the finding[s] of guilty [were] against the weight of the evidence," I generally credit EW's testimony and focus on whether the substance of her testimony, and the other evidence, support the convictions. Article 66(d)(1)(B)(ii)(I), UCMJ; 10 U.S.C. § 866(d)(1)(B)(ii)(I) (2024 *MCM*).

## B. Specification 1 of Charge I – Abusive Sexual Contact by Touching EW's Breast with Appellant's Hand on Divers Occasions

The court members found Appellant guilty of the specification as charged, including that Appellant committed the offense "on divers occasions." EW testified Appellant touched her breast with his hand without her consent on four occasions: twice during an incident "a couple of days" into their relationship as they were watching a movie together, and on two later occasions when Appellant touched her in a "similar manner" to the prior incident. I would affirm the finding of guilty to this specification after modifying it to remove the "on divers occasions" language and inserting language to identify the single occasion I

---

[4] Considering the circumstances as a whole, I find it of little significance that EW, as a 21-year-old Airman without any particular legal training, may have mislabeled Appellant's conduct as "sexual assault" rather than other offenses under the UCMJ.

find factually sufficient. *See generally United States v. Walters*, 58 M.J. 391 (C.A.A.F. 2003). I address each of the alleged touches below.

The first instance EW described occurred as Appellant and EW were watching a movie together after Appellant moved his arm from her shoulder to her waist, and then under her shirt. EW did not object at that point. Appellant then "cupped" her breast with his hand, at which point EW removed his hand and told him, in essence, she did not want him to do that. I find this evidence supports a conclusion that Appellant touched EW's breast without her consent. However, given that EW did not object as Appellant progressed from having his hand on her shoulder, to her waist, and then inside her shirt before touching her breast, I do not find the Government disproved beyond a reasonable doubt that Appellant had an honest and reasonable mistake of fact that EW would consent to the touching. I note EW testified it was after this incident that EW specifically told Appellant what sort of touching she was and was not comfortable with. Considering the totality of the evidence, I am clearly convinced including this touch in the conviction would be against the weight of the evidence.

However, I would affirm the specification, as modified, based on the second touch EW testified to. Immediately after EW told him not to touch her breast and moved his hand away, Appellant told EW that "as a man he needed certain things" and put his hand back on her breast. "An expression of lack of consent through words or conduct means there is no consent." *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.a.(g)(7)(A). Although EW did not protest further, "[l]ack of verbal or physical resistance does not constitute consent." *Id*. Although EW testified "[t]he line was blurred sometimes on what was okay and what was not," EW had not acquiesced to having her breast touched prior to this incident; it occurred only a couple of days into their new relationship; and on this occasion EW had made her nonconsent clear before Appellant touched her the second time. I find the evidence disproves any honest and reasonable mistake of fact as to consent on Appellant's part.

I do not find EW's very brief testimony that Appellant touched her breast "two other times" in a "similar manner" proves additional instances of abusive sexual contact as alleged in the specification. After EW did not verbally or physically resist the second breast touch described above, Appellant may have believed he had succeeded in getting EW to acquiesce to such conduct in the future. Although EW testified that she subsequently spoke to Appellant to the effect that she did not want him to touch her breast, she also testified that "the line was blurred sometimes." EW's testimony that the subsequent touches were in a "similar manner" is unclear as to whether they were similar physically (*i.e.*, the manner in which he put his hand on her breast), or similar in

that she objected or removed his hand, or similar in that she did not object or resist. Given the paucity of evidence elicited by the Government, I am clearly convinced including these touches in the conviction would also be against the weight of the evidence.

## C. Specification 2 of Charge I – Abusive Sexual Contact by Touching EW's Vulva with Appellant's Thigh

I find the Government introduced sufficient evidence to prove beyond a reasonable doubt that Appellant touched EW's vulva with his thigh, with an intent to gratify his sexual desires, and without her consent. EW testified that prior to 11 May 2022 she told Appellant she did not want to date him anymore, and "just wanted to be friends but nothing else." On 11 May 2022, EW spent part of the day at SSgt JK's house and did not respond to Appellant's repeated messages asking where she was. When Appellant came to her room later, she told him she had been at SSgt JK's house. Appellant grabbed EW by the wrists and pushed her down on the bed as he lay on top of her, his chest on her chest, and his forearms aligned with hers. Appellant held her down in that position for approximately five minutes, pushing back when she tried to push him off, and ignoring her pleas for him to get off her. During that time he spoke to her about why she preferred SSgt JK to Appellant while her head was turned away from him. After about five minutes, Appellant tried to kiss EW with his tongue, which she resisted by keeping her mouth closed. This continued for about ten seconds until Appellant saw EW was crying, when he left.

EW testified Appellant's "leg" was between her legs and touching her vulva while he was on top of her; she did not use the word "thigh" as alleged in the specification. However, it is not always essential that a witness use the precise terms used in the specification in order to prove an accused's guilt beyond reasonable doubt; what is essential is to prove the words in the specification constituting the essential elements are true beyond a reasonable doubt. *See United States v. Westcott*, No. ACM 39936, 2022 CCA LEXIS 156, at *17–25 (A.F. Ct. Crim. App. 17 Mar. 2022) (unpub. op.) (finding conviction legally and factually sufficient despite victim's testimony not using the term "groin" as alleged in the specification), *rev. denied*, 82 M.J. 438 (C.A.A.F. 2022). The relevant definition of "thigh" refers to "the proximal segment of the vertebrate hind or lower limb extending from the hip to the knee." *Thigh*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/thigh (last visited 16 Jul. 2025). In simpler terms, Appellant's "thigh" was the upper portion of his leg from the hip to the knee. Based on EW's testimony regarding how Appellant was lying on top of her, chest to chest and forearm to forearm, the part of Appellant's leg that reasonably would have been in contact with her vulva would have been the upper portion—that is, his thigh.

In addition to EW's testimony that Appellant's leg was between her legs, Appellant later sent a text message admitting he "put [his] leg between [her] legs in hopes of making [her] give in to [her] feelings." This message tends to confirm that Appellant intentionally put his leg between EW's legs. The court members could also reasonably find it tended to substantiate that Appellant placed his leg against the intimate areas of EW's body, plausibly including her vulva, given that his admitted intent was to arouse romantic or sexual feelings in her. I find it reasonable to infer that if Appellant and EW remained in this position for approximately five minutes, their bodies likely shifting against each other as EW repeatedly attempted to push Appellant off, it was more likely Appellant's thigh contacted EW's vulva through their clothing at some point.

I find the evidence also supports the conclusion that Appellant was motivated, at least in part, by an intent to gratify his sexual desires. Appellant may have been motivated in part by a hope or intent to arouse feelings in EW when he put his leg between her legs. However, the court members were not required to find Appellant's intent was *exclusively* to gratify his sexual desires, so long as such an intent was present. Under the circumstances, including Appellant's pre-existing sexual interest in EW, his attempt to kiss her with his tongue, his later text message and EW's testimony that they had engaged in similar behavior on a consensual basis on previous occasions (implying Appellant found it gratifying), and Appellant's evident disregard for EW's wishes on this occasion, it would be reasonable to conclude Appellant found placing his thigh against EW's vulva sexually gratifying.

Finally, I find the evidence supports the conclusion that EW did not consent to this contact, and Appellant had no honest and reasonable mistake of fact that she consented. EW testified that prior to 11 May 2022, she did not want to continue their dating relationship and only wanted to be friends with Appellant. Indeed, the entire context for the 11 May 2022 incident in EW's room was Appellant's distress and dissatisfaction that EW now wanted a relationship with SSgt JK and not with Appellant. Accordingly, it was not reasonable for Appellant to assume on 11 May 2022 that EW consented to intimate behavior they had previously engaged in. In addition, EW testified Appellant held her down and ignored her pleas for him to get off her. Appellant admitted in a later text message that EW "tried to push [him] away several times when [he] was on top of [her]," but he refused to "back away." To the extent Appellant might have had any honest belief that EW consented to what he was doing to her on 11 May 2022, it was not a reasonable belief.

Accordingly, I am not clearly convinced the court members' finding of guilty as to this specification is against the weight of the evidence.

**D. Conclusion**

For the reasons stated above, I would modify and affirm Specification 1 of Charge I, affirm Specification 2 of Charge I, and affirm Charge I as legally and factually sufficient; affirm Specification 1 of Charge II, and Charge II as legally sufficient; and reassess the sentence.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court